J-S53021-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ARTHUR MCCORKLE | : | |
| | : | |
| Appellant | : | No. 3790 EDA 2017 |

Appeal from the Judgment of Sentence September 26, 2017
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0000595-2017

BEFORE:   GANTMAN, P.J., OTT, J., and PLATT*, J.

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 19, 2018**

Arthur McCorkle appeals from the judgment of sentence entered on

September 26, 2017, in the Bucks County Court of Common Pleas, made final

by the denial of a post-sentence motion on October 20, 2017.  On June 20,

2017, McCorkle pled guilty[1] to two counts of aggravated assault, robbery,

burglary, theft by unlawful taking, possession of an instrument of crime,

unlawful restraint, and false imprisonment, as well as counts of conspiracy to

commit each of the above offenses.[2]  The court sentenced McCorkle to an

_____

* Retired Senior Judge assigned to the Superior Court.

[1] McCorkle pled guilty along with his co-defendants, Daron K. Davis and
Keliyah NJ Reaves.  Neither co-defendant is a party to this appeal.

[2] 18 Pa.C.S. §§ 2702(a)(1) and (a)(4), 3701, 3502(a)(1), 3921(a), 907(a),
2902(a)(1), 901(a), and 903, respectively.

aggregate term of 25 to 50 years' incarceration. On appeal, McCorkle challenges the discretionary aspects of his sentence. Based on the following, we affirm.

The trial court recited the facts, which was set forth by the assistant district attorney at McCorkle's sentencing hearing, as follows:

[O]n November 26th of 2016, at approximately 3:36 p.m., Bucks County Police radio received a call of a male covered in blood at the Grey Friars apartment complex in New Britain Township, Bucks County.

On scene, responding officers located Thomas Grimes, the victim, who had been stabbed, beaten and his throat slashed, with blood pouring out of a gaping wound in his throat. Because of his throat being slashed, Grimes was unable to communicate with police officers. However, he was able to write a few notes on a note pad before feeling like he was passing out due to the significance of his injuries.

Grimes indicated that approximately 30 minutes earlier, he was awakened by two black males, later identified as Defendants McCorkle and Davis, standing at his bed pointing guns in his face. Grimes noted that they were strangers. Responding officers noted that there were no signs of forced entry to the apartment. [The i]nvestigation revealed that entry to the apartment was arranged and the robbery set up by Defendant Reaves. Reaves had been an acquaintance of Mr. Grimes' roommate and had been in the apartment and met Mr. Grimes several times prior because of her acquaintance with Grimes' roommate, Rafeeq James; specifically, Reaves had a romantic relationship with James' nephew, with whom she had stayed at the apartment numerous times and had met James and Mr. Grimes.

While in the apartment, Reaves noticed that Mr. James had numerous very nice items, such as shoes and watches, and, based on her observations, arranged with Defendants McCorkle and Davis to take Mr. James' items from the apartment when he was not present on November 26th. On November 26th, investigation revealed that Reaves had entered the Blue Dog Tavern in New Britain Township on multiple occasions, asking to speak with

- 2 -

Rafeeq James, who was working there that day. When speaking with James, Reaves mentioned she was supposed to meet James' nephew at the apartment. A made-up story told -- that was a made-up story told to facilitate James calling his roommate, Grimes, to allow Reaves to come into the apartment and allegedly wait for James' nephew. James did call Grimes and instructed Grimes to allow Reaves in to wait for Anthony Bazelle, his nephew.

Thomas Grimes unlocked the front door to allow Reaves entry and went back to sleep in his room, after working much of the previous night. Minutes later, Grimes was awakened by Defendants Davis and McCorkle, standing above him, each with firearms, asking where James' items were and questions about a combination to the safe. Grimes continuously answered that he did not know the combination, and Davis and McCorkle continued getting more violent. Defendant Reaves was located in the living room at this time.

Grimes was pistol whipped by McCorkle, causing multiple wounds to the head. He also had one of the pistols placed on his testicles, as he was on all fours on the floor, with both defendants continuing to ask about the items in the safe. Grimes' arms and legs were bound by the actors. Grimes was handed a picture of his infant daughter that had been on the wall and told that this was the last time, he was going to see her if their demands were not met. The picture was held in front of his face. Despite attempting to comply with the actors, Grimes was beaten, and cut multiple times on his body.

After this time period, Defendant McCorkle left the room and ransacked Rafeeq James' room with the assistance of Defendant Reaves. Multiple bags of items were taken, including a dozen pair of shoes, watches, two XBox consoles and cash. While McCorkle and Reaves were ransacking the apartment, Davis remained in the bedroom with Grimes. Grimes was asked two questions that made him believe that he was not going to make it out alive. First, whether his neighbors downstairs were home; and, secondly, whether he had a sack of potatoes, which would act as a silencer on a firearm. When Grimes responded that his neighbors were home and he had no potatoes, Defendant Davis pushed Grimes' head down onto the bed, held it with one hand, and sliced his throat with a box cutter. When Grimes tried to push back up, the defendant sliced the back of his throat.

Defendant McCorkle and Reaves rushed out of the house with all the items, including Grimes' phone, leaving him for dead. Grimes played dead for a short period of time, then staggered to his feet, wrapped a towel around his neck, with blood pouring out of his neck, and then made it to a neighbor's front door, who called for help, as he was unable to speak.

At approximately 11:00 p.m. that evening, all three defendants were stopped in Bensalem at the Neshaminy Valley Inn during another investigation. At that time, Daron Davis was in possession of a Smith and Wesson 38-caliber firearm, subject to the second case, and was arrested for persons not to possess a firearm, as he had a prior offense out of Philadelphia for carrying a firearm without a license.

Defendants McCorkle and Reaves were let go that evening; however, picked up two days later in Philadelphia after being positively identified by Grimes during the photo lineup.

A search warrant was conducted at the home of McCorkle in Philadelphia, and multiple items from the New Britain incident were found there. When Davis was arrested, he was wearing multiple items of Mr. James, including a Gucci watch and Gucci sneakers.

During the course of the police investigation, police executed numerous search warrants and court orders on cell phones belonging to all three defendants. During review of those phone dumps, specific conversations between Reaves, who was inside the apartment at the time, and McCorkle, were retrieved, during which specific instructions were given about when it would be the right time to enter the apartment.

Additionally, conversations about the setup of the robbery were retrieved, and it was discovered that the robbery had been set up three days prior to the event between the three. Following the event, there were multiple discussions retrieved from Defendant McCorkle's phone revealing discussion of selling numerous items stolen from the robbery.

Interviews with Defendant Reaves -- interviews were conducted with Defendant Reaves, and she stated that she observed Defendant Davis leave Grimes' bedroom with a bloodied box cutter and blood all over a book bag and camouflage pants he was

wearing. Reaves described McCorkle backing into a parking spot directly in front of the apartment and opening the trunk of the car to put the items stolen in there. Additionally, Reaves described multiple conversations that occurred while the three were driving away from the scene between Davis and McCorkle, where they bragged about what they had done to Grimes, believed him to be dead, and noted, quote, I slit his throat. His stuff was hanging out of his neck.

Additionally, Davis stated "That nigger would not die. I had to stab him in the back of his neck because he would keep on moving." Davis and McCorkle were laughing when discussing Grimes and his injuries. It was Reaves' belief that both McCorkle and Davis believed Grimes to be dead when they left the apartment.

Grimes' phone was thrown out of the window of McCorkle's truck as they were leaving down Route 309. Reaves advised that all McCorkle's clothing were discarded in Philadelphia.

Mr. Grimes was rushed to Abington Memorial Hospital where he underwent lifesaving surgery to repair life-threatening wounds to his esophagus from his throat being cut multiple times with a box cutter by Defendant Davis. After waking up from surgery, doctors explained while his life was saved, it was 90 percent likely that his voice was going to be lost. Following ten days in the hospital, the victim regained partial use of his voice; however, remained with a feeding tube for several months following the incident.

Trial Court Opinion, 4/30/2018, at 2-5.

On November 29, 2016, McCorkle was charged with numerous offenses relating to the home invasion and assault. On June 20, 2017, he entered an open guilty plea to all charges set forth in the criminal information. On September 26, 2017, prior to sentencing, the Commonwealth requested and

was granted leave to *nolle pros* certain counts.[3] McCorkle's plea to the remaining counts, as provided above, stayed unchanged. The matter then proceeded to sentencing.[4] The court imposed the following sentence: (1) a term of 106 to 212 months' imprisonment for aggravated assault; (2) a consecutive term of 118 to 236 months' incarceration for robbery; and (3) a consecutive term of 76 to 152 months' imprisonment for burglary.[5]

McCorkle filed a post-sentence motion for reconsideration, which was denied by the court without a hearing on October 20, 2017. This timely appeal followed.[6]

In his sole issue on appeal, McCorkle contends the trial court abused its discretion by imposing an aggregate sentence of 25 to 50 years because the sentences were at or near the top of the aggravated range on individual counts, the trial court did not adequately set forth sufficient reasons on the record for imposing such sentences, and it failed to consider certain mitigating

---

[3] Specifically, the Commonwealth *nolle prossed* charges of attempted homicide, criminal trespass and attempt and conspiracy to the same, and attempt and conspiracy to receiving stolen property.

[4] McCorkle was sentenced at the same time as Davis and Reaves.

[5] The trial court ordered costs of prosecution and restitution, but did not impose a further penalty with the remaining convictions. McCorkle was also given credit for time served.

[6] On November 16, 2017, the trial court ordered McCorkle to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). McCorkle had simultaneously filed a concise statement with his notice of appeal on November 16, 2017. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 30, 2018.

evidence. *See* McCorkle's Brief at 8. Specifically, McCorkle argues that prior to sentencing his co-defendant, Davis, the court noted it must consider numerous factors, including the sentencing guidelines, the protection of the public, and the defendant's age. McCorkle notes the court referenced Davis's involvement in the attack when it imposed its sentence but with respect to McCorkle:

> The [trial c]ourt did not make any additional comments before sentencing [McCorkle], although undoubtedly the initial comments were meant to be applied to all defendants. The [c]ourt then sentenced [McCorkle] to the same sentence as co-defendant Davis. It is notable that the [trial c]ourt did not address, in any meaningful way, the testimony presented in mitigation on [McCorkle]'s behalf[,] or distinguish [McCorkle] from co-defendant Davis who actually slit Mr. Grimes' throat. The [trial c]ourt did not make any other comment regarding [McCorkle]'s age except as [noting that it must consider the defendant's age]. This is significant because at the time of the incident, [McCorkle] was 19 years old. Additionally, the [trial c]ourt did not draw any distinction between [McCorkle] and co-defendant Davis based on their prior records, other pending criminal cases or their backgrounds. This lack of distinction between the perpetrators of the crime and their relative involvement speaks to the manifest unreasonableness of the sentence and the singular focus on the nature of the crime without considering [McCorkle]'s age, maturity, personal circumstances and testimony presented by family and friends.

*Id.* at 12-13 (record citations omitted).

With respect to a discretionary aspect of sentencing claim, we are guided by the following. The standard of review for a claim challenging the discretionary aspects of sentencing is well-established:

> Sentencing is a matter vested in the sound discretion of the judge, and will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is not shown merely by an error

- 7 -

in judgment. Rather, the appellant must establish, by reference to the record, that then sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (citation omitted), *appeal denied*, 980 A.2d 607 (Pa. 2009).

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." ***Commonwealth v. Hoch***, 936 A.2d 515, 518 (Pa. Super. 2007) (citations and quotation marks omitted). To reach the merits of a discretionary issue, this Court must determine:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Commonwealth v. Dunphy***, 20 A.3d 1215, 1220 (Pa. Super. 2011) (footnotes omitted).

Here, McCorkle filed a timely notice of appeal and included the requisite statement pursuant to Pa.R.A.P. 2119(f) in his appellate brief. However, a review of his post-sentence motion reveals that McCorkle did not raise his contention regarding the discretionary aspects of his sentence in the motion. Rather, McCorkle alleged the following, in relevant part:

> 4. At the time of sentencing, sentencing guidelines were presented to the Court that incorrectly calculated [McCorkle]'s Prior Record Score and therefore contained incorrect guideline ranges for each of the counts to which [McCorkle] was sentenced.

5. At the time of sentencing, [McCorkle] failed to present rebuttal testimony regarding statements made by co-defendants regarding his participation in the crimes to which he plead guilty.

6. At the time of sentencing, [McCorkle] failed to present testimony regarding the extent of his drug use immediately prior to the incident giving rise to the crimes to which he plead guilty.

7. [McCorkle] requests to present additional testimony/argument regarding significant differences between individuals of [McCorkle]'s age and older adults, including the belief that children have a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk-taking, as well as the notion that a younger individual's character is not as well informed as an older adult's character and therefore his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

Motion for Reconsideration of Sentence, 10/4/2017, at unnumbered 1-2.[7]

It is well-established that "where the issues raised assail the trial court's exercise of discretion in fashioning the defendant's sentence, the trial court must be given the opportunity to reconsider the imposition of the sentence either through the defendant raising the issue at sentencing or in a post-sentence motion." *Commonwealth v. Tejada*, 107 A.3d 788, 798 (Pa. Super. 2015), *appeal denied*, 119 A.3d 351 (Pa. 2015). Furthermore, "[t]he

---

[7] Moreover, McCorkle did not properly preserve this claim at the time of the sentencing hearing. *See* N.T., 9/26/2017, at 98-101.

- 9 -

failure to do so results in waiver of those claims." *Id.* Accordingly, we find

McCorkle's argument waived, and need not address it further.[8]

Judgment of sentence affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/18

---

[8] Assuming, *arguendo*, McCorkle had successfully raised and preserved this issue for appeal, we would have concluded that his current sentence is not excessive and the trial court provided sufficient reasoning for the sentence imposed. *See* Trial Court Opinion, 4/30/2018, at 5-10.